[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The defendant, United Business and Industry Federal Credit Union (the "Credit Union") has moved to strike Counts One through Seven of the eight count Amended Complaint dated June 19, 1998. The plaintiff has agreed to withdraw three of the counts, Count Three, promissory estoppel, Count Five, which alleges unjust enrichment, and Count Six for negligent misrepresentation. Count One, which alleges failure to pay overtime wages in violation of Connecticut General Statutes § 31-76c, Count Two, wrongful discharge, Count Four, breach of contract, and Count Seven, negligent infliction of emotional distress, remain the subjects of the Motion to Strike. Count Eight, which alleges sex discrimination, is the only count which the Credit Union does not seek to strike.
Statement of Facts
The Amended Complaint alleges that the Credit Union is a federal credit union based in Plainville, Connecticut. ¶ 2. The plaintiff is the wife of Stephen Skorupski, who was the Credit Union's president and CEO from 1968 to May 1998. ¶ 4. The Credit CT Page 3254 Union originally hired the plaintiff in 1983. ¶ 3. Throughout her employment, the plaintiff served in a number of different capacities. She was originally hired to develop the Credit Union's new branch in Berlin, Connecticut, and later served as "Payroll Coordinator" and "Data Processing Manager." ¶ 6.
In March 1996 the plaintiff was put in charge of a project to design and build the Credit Union's new Headquarters Par; 10-11. After sixteen months the plaintiff resigned as project manager for the building project "out of fear that if she continued her involvement with the new building project she could be held accountable by the NCUA for the project exceeding the approved budget." ¶ 19. Following her resignation as project manager in December, 1997, the plaintiff's employment was eventually terminated on January 27, 1998. ¶¶ 22-26. The plaintiff alleges that she was told that she was being terminated because her continued employment violated company policies against nepotism and conflicts of interest and because continued employment of her and her husband put the Credit Union at risk in the event something happened to both of them. ¶ 23.
Discussion of the Law and Ruling
The function of a motion to strike is to test the legal sufficiency of a pleading. Practice Book 152; Ferryman v. Groton,212 Conn. 138, 142, 561 A.2d 432 (1989); Mingachos v. CBS, Inc.,196 Conn. 91, 108, 491 A.2d 368 (1985). In deciding a motion to strike the trial court must consider as true the factual allegations, but not the legal conclusions set forth in the complaint. Liljedahl Bros., Inc. v. Grigsby, 215 Conn. 345, 348,576 A.2d 149 (1990); Blancato v. Feldspar Corp., 203 Conn. 34,36, 522 A.2d 1235 (1987).
The court should view the facts in a broad fashion, not strictly limited to the allegations, but also including the facts necessarily implied by and fairly probable under them. Dennisonv. Klotz, 12 Conn. App. 570, 577, 532 A.2d 1311 (1987). In ruling on a motion to strike, the court must take as admitted all well-pled facts, and those necessarily implied thereby, and construe them in the manner most favorable to the pleader.Norwich v. Silverberg, 200 Conn. 367, 370, 511 A.2d 336 (1986).
Failure to Pay Overtime
The Credit Union asserts that the First Count should be CT Page 3255 stricken because it alleges facts which prove that the plaintiff was an "exempt" employee who was not entitled to overtime pay under Connecticut General Statutes § 31-76i(e). The plaintiff's claim is based on Connecticut General Statutes §31-76c, which requires employers to pay eligible employees at a rate not less than one and one-half times the regular rate of pay for all hours worked in excess of forty per week. However, an employer is not required to pay overtime to any "individual employed in a bona fide executive, administrative or professional capacity as defined in the regulations of the Labor Commissioner." Connecticut General Statutes §§ 31-58(f),31-76i(e). Such employees are considered "exempt."
The Labor Commissioner has defined an employee in a bona fide executive capacity as:
 any employee (a) whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and (b) who customarily and regularly directs the work of two or more other employees therein; and (c) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and (d) who customarily a regularly exercise discretionary powers; and (e) who does not devote more than twenty percent, or, in the case of an employee of a retail or service establishment who does not devote as much as forty percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in subdivisions (a) to (d), inclusive, of this section;
Conn. Agencies Regs. § 31-60-14.
An individual is employed in a bona fide administrative capacity when her "(a) primary duty consists of . . . the performance of office or nonmanual work directly related to management policies general business operations of [her] employer or [her] employer's customers," (b) she customarily and regularly exercises discretion and independent judgment, (c) she "executes under only general supervision special assignments and tasks," (d) she does not devote more than twenty percent of her hours to activities that are not directly and closely related to the performance of her job, and (e) she is compensated on a salary CT Page 3256 basis. Conn. Agencies Regs. § 31-60-15.
In addition to affirmatively alleging that she was an exempt employee, the plaintiff alleges facts which bring her within either the executive or administrative capacity exemptions described above. The primary factor in the determination of whether a person is employed in bona fide executive capacity, and thus exempt from overtime compensation, is the nature of his or her duties. Butler v. Hartford Technical Institute, Inc.,243 Conn. 454, 467, 704 A.2d 222 (1997). The plaintiff has alleged that she was head of Payroll, head of Data Processing, and Project Manager in charge of a project to design and build the Credit Union's new headquarters. She has also alleged the job duties of the Payroll/Data Processing Coordinator position and other duties and responsibilities assigned to her by the defendant required her to spend over forty hours per week working for the defendant. Amended Complaint ¶ 9. The Amended Complaint does not allege that at any time between 1983 and 1998 plaintiff challenged her exempt status or demanded overtime pay.
In opposition to the Motion to Strike, the plaintiff has argued that "defendant's exemption argument requires consideration of numerous facts not found in the plaintiff's complaint." Plaintiff's Memorandum in Opposition to Motion to Strike, ¶ 8. The allegations of the Amended Complaint constitute judicial admissions. Schenck v. Pelkey, 176 Conn. 245, 248,405 A.2d 655 (1978), that the plaintiff was an supervisory and managerial employee who exercised discretion and independent judgment and was exempt for overtime purposes. Since a judicial admission dispenses with the production of evidence by the opposing party as to the fact admitted, and is conclusive upon the party making it, Real Estate Auctions, Inc. v. Senie,28 Conn. App. 563, 572, 611 A.2d 452 (1992), there is no need to consider "numerous facts not found in the plaintiff's complaint" as to the issue of whether or not the plaintiff was an exempt employee for overtime purposes. Her own complaint clearly alleges that she was. Therefore, the Motion to Strike the First Count is granted.
Wrongful Termination
In Count Two of the Amended Complaint, the plaintiff alleges that she acted as Project Manager of the building of the defendant's new headquarters. She further alleges that her termination was in retaliation for her refusal to make and/or her CT Page 3257 voicing objections to modifications to building plans which would have resulted in the building exceeding budgetary guidelines of the National Credit Union Administration(NCUA). In the alternative, she alleges that she was terminated because she refused to continue working as project manager without pay. The defendant argues that as a matter of law the foregoing allegations do not support a claim for wrongful termination.
The Connecticut Supreme Court articulated a narrow exception to the employment at will rule when it recognized a common law cause of action in tort for dismissal from employment "if the former employee can prove a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." Sheets v. Teddy's FrostedFoods, Inc., 179 Conn. 471, 475, 427 A.2d 385 (1980)
In Sheets the plaintiff was employed by the defendant, a producer of frozen food products, as its quality control director and operations manager. In his capacity as quality control director and operations manager, the plaintiff noticed deviations from the specifications contained in the defendant's standards and labels, in that some vegetables were substandard and some meat components underweight. These deviations violated statutes regulating the labeling of food. In May of 1977, the plaintiff communicated in writing to his employer concerning the violations. His employment was terminated some five months later.
In formulating the so-called "public policy" exception to the employment at will doctrine, the Court in Sheets stated:
 The issue then becomes the familiar common-law problem of deciding where and how to draw the line between claims that genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not. We are mindful that courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation. We are, however, equally mindful that the myriad of employees without the bargaining power to command employment contracts for a definite term are entitled to a modicum of judicial protection when their conduct as good citizens is punished by their employers.
179 Conn. at 477 (Emphasis added.) CT Page 3258
Under the public policy exception the "defendant's reason fordischarging the plaintiff must contravene public policy."Battista v. United Illuminating Co., 10 Conn. App. 486, 498,523 A.2d 1356 (1987) (Emphasis added). A discharge is not actionable without "more than an incidental effect on public policy."Battista, 10 Conn. App. 497. Where a public policy violation is merely incidental to termination of employment, the public policy exception does not apply. Thus, in Morris v. Hartford Courant,Co., 200 Conn. 676, 680, 513 A.2d 66 (1986) the Court held that a false but negligently made accusation of criminal conduct did not constitute a public policy violation sufficient to permit the plaintiff to claim wrongful termination under Sheets. In Carbonev. Atlantic Richfield Co., 204 Conn. 460, 528 A.2d 1137 (1987), the Court held that an employee's claim that he had been discharged in an abusive manner was not sufficient because "the reason for or the manner of discharge must be not only demonstrably improper, but the impropriety must be derived from some important violation of public policy." 204 Conn. at 469.
The budget guidelines of the NCUA do not embody the type of important public policy required to invoke the narrow exception to the termination at will rule. Although the complaint does not identify any statute or regulation which contains those guidelines, the plaintiff appears to be referring to12 C.F.R. § 701.36(c) which requires credit unions to seek the approval of the NCUA before investing in a fixed asset such that "the aggregate of all such investments exceeds 5 percent of shares and retained earnings." If a credit union's request for approval is not responded to within 45 days, it is deemed granted. 29 C.F.R. § 701.36(c). The plaintiff is alleging that during the course of designing the Credit Union's new headquarters, she was asked to make changes that she believed would have caused the value of the Credit Union's total fixed assets invested in the headquarters to exceed five percent of its shares and earnings.
The plaintiff argues that under Faulkner v. UnitedTechnologies Corporation, 240 Conn. 576, 693 A.2d 293 (1997) an employee's refusal to violate a federal regulation can serve as the foundation for a wrongful termination claim under Sheets. The Court in Faulkner stated:
The plaintiff in the present case, like the plaintiff in Sheets, held a position requiring him to ensure the quality of the defendant employer's products. If he had followed his superiors' orders, and had approved the use of CT Page 3259 helicopter parts that he knew to be substandard and defective, he might have exposed himself to potential criminal sanction pursuant to 18 U.S.C. § 1031.
240 Conn. at 584.
In this case, a violation of § 701.36(c) would not have exposed the plaintiff to any criminal penalty. But more importantly, the plaintiff has not plead that she refused to condone her employer's violation of that regulation. Unlike the statutes involved in Sheets, or the regulations involved inFaulkner, the regulation here is not an absolute prohibition against engaging in the regulated conduct. A credit union can build a headquarters using more capital than allowed under regulation as long as it obtains approval from the NCUA. Moreover, the NCUA's failure to act on the request for such approval within 45 days is deemed to be approval. Therefore, without alleging that the Credit Union would not have been able to obtain such approval, or had already sought such approval, and had been turned down, the plaintiff has not alleged her refusal to take part in her employer's violation of the law, as required under Sheets and Faulkner.
In the alternative, the plaintiff argues that "she was terminated in retaliation for refusing to perform duties without compensation." Plaintiff's Memorandum in Opposition to Motion to Strike at 12. According to the plaintiff this "implicates both state and federal fair employment practices statutes." Id.
However, in making this argument the plaintiff ignores the well-settled law that a claim for wrongful discharge exists only where the employee is otherwise without a remedy. Burnham v. Karl Gelb, P.C., 50 Conn. App. 385, 395-96, ___ A.2d ___ (1998). Here it is undisputed that both state and federal law provide a remedy for employees who have not been paid for their services and employees who have been retaliated against for complaining about not being paid. See Connecticut General Statutes §31-69b ("An employer shall not discharge, discipline, penalize or in any manner discriminate against any employee because of the exercise by such employee on behalf of himself or others any right afforded [under this chapter].");29 U.S.C. § 215(a)(3(("[I]t shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify CT Page 3260 in any such proceeding . . .") The plaintiff acknowledges this point in her Memorandum when she cites Connecticut General Statutes § 31-60(a) which entitles covered employees to a minimum wage and overtime. See Plaintiff's Memorandum in Opposition to Motion to Strike at 13.
In Burnham v. Karl Gelb, P. C., supra, an office manager in a dental office alleged that she had been terminated "for reporting the unsanitary and unhealthy practices of her employers" to OSHA and the state dental association. The Appellate Court held that the plaintiff could not maintain a claim for wrongful discharge because "OSHA provides a remedy for employees that claim retaliatory termination." Id. at 395-96.
For the reasons stated above, the plaintiff has failed to state a cause of action for wrongful termination and Count Two is hereby ordered stricken.
Implied Contract
In Count Four of the Amended Complaint the plaintiff alleges that she never entered into a formal contract of employment with the Credit Union and therefore "the official policies of the defendant constitute the terms of the employment contract between the parties." Count Four ¶ 34 The official policy to which the plaintiff refers is that contained in the Credit Union's Human Resources Manual which provides that when there is a direct reporting arrangement between two married employees, "the credit union will attempt to arrange a transfer of one of the employees." Id. ¶ 33. Nowhere in the Amended Complaint does the plaintiff allege that she did have a direct reporting arrangement with her husband, Stephan Skorupski, president and CEO of the Credit Union. Moreover, the Amended Complaint further alleges the existence of two "company policies" of undisclosed source. The first such policy "prohibited any direct or indirect reporting relationship or the appearance of or potential for conflict of interest between immediate family members." The second "company policy" allegedly provided that "employees of the funds transfer unit should not have relatives employed in other units of the institution, such as data processing or accounting functions, which have a working relationship with the funds transfer unit."Id. ¶ 23.
Under Connecticut law both contracts of permanent employment or for an indefinite term of employment are terminable at will by CT Page 3261 the employer, Battista v. United Illuminating Co.,10 Conn. App. 486, 495, 523 A.2d 1356 (1987), without any requirement that the employer have good cause for such termination.Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471,474, 427 A.2d 385 (1980).
"A contract implied in fact, like an express contract, depends on actual agreement. D'Ulisse-Cupo v. Board of Directorsof Notre Dame High School, 202 Conn. 206, 211 n. 2, 520 A.2d 217
(1987); Therrien v. Safeguard Mfg Co., 180 Conn. 91, 94,429 A.2d 808 (1980); Brighenti v. New Britain Shirt Corporation,167 Conn. 403, 406, 356 A.2d 181 (1974); Corriveau v. Jenkins Bros.,144 Conn. 383, 387, 132 A.2d 67 (1957)." Coelho v. Posi-SealInternational, Inc., 208 Conn. 106, 111-12, 544 A.2d 170 (1988). Accordingly, to prevail on his wrongful termination claim, "which alleged the existence of an implied agreement between the parties, the plaintiff had the burden of proving by a fair preponderance of the evidence that [the defendant] had agreed, either by words or action or conduct, to undertake [some] form of actual contract commitment to him under which he could not be terminated without just cause [following progressive disciplinary measures]. D'Ulisse-Cupo v. Board of Directors of Notre Dame HighSchool, supra, 212 n. 2; Therrien v. Safeguard Mfg Co., supra,94-95." Id., 112.
The plaintiff alleges that under the foregoing "company policies" the Credit Union could not terminate her employment unless it first attempted a transfer of either her or her husband.
In Reynolds v. Chrysler First Comm. Corp., 40 Conn. App. 725,673 A.2d 573 (1996), the Appellate Court upheld a summary judgment granted in favor of the employer where the employee alleged that the employer's regular use of progressive discipline policies gave rise to an implied contract. The Court held that the employee's understanding alone was insufficient evidence of the formation of a contract:
"A contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties." Christensen v. Bic Corp., 18 Conn. App. 451, 458, 558 A.2d 273 (1989). "The mere fact that the plaintiff believed the guidelines to constitute a contract does not bind [the defendant] without some evidence that it intended to be bound to such a contract. See Brighenti v. New BritainCT Page 3262 Shirt Corporation, [supra, 167 Conn. 407]." Id., 458.
40 Conn. App. at 730.
The plaintiff here has "plucked phrases out of context" in alleging her implied contract claim. Even when taken in a manner most favorable to the plaintiff it is difficult to see how the various policies amount to the Credit Union's "undertak[ing] of [some] form of actual contractual commitment to" her that she could not be terminated unless the Credit Union first attempted to transfer her out of a direct reporting relationship with her husband. See D'Ulisse-Cupo v. Board of Directors of Notre DameHigh School, supra, 212. First of all, the plaintiff has failed to allege a "direct reporting relationship" with her husband which would trigger the Credit Union's obligation to "attempt to transfer". Secondly, the "attempt to transfer" language cannot be construed as constituting the Credit Union's contractual commitment that it could not terminate an at will employee with a direct reporting nepotism conflict unless it first attempted to transfer that employee. Finally, if the "company policies" alleged in paragraph twenty-three of the Amended Complaint constitute an implied contract at all, the terms of that contract would have prevented the plaintiff's employment with the Credit Union ab initio. Her husband was the president and CEO of the Credit Union during the entire period of her employment. If the foregoing "policies" were also in effect during that period, then her employment always violated those policies.
The "policies" on which the plaintiff relies make no mention of the subject of job duration or termination, unlike the statements in Torosyan v. Boehringer Ingelheim Pharmaceuticals,Inc., 234 Conn. 1, 662 A.2d 89 (1995) (In response to the plaintiff's preemployment questions about the long term nature of his job with the defendant one of the defendant's managers told the plaintiff that if he did a good job, the defendant would "take care" of him and another interviewer told the plaintiff that he hoped that the plaintiff would stay forever); Finley v.Aetna Life Casualty co., 202 Conn. 190, 520 A.2d 208 (1987) (The defendant's employee manual provided, in a section subtitled "Involuntary Terminations (Dismissals)," that "[i]t is Company policy to terminate any employee who cannot perform satisfactorily, whose attendance is poor, or who is otherwise unsuited to his job."); or D'Ulisse-Cupo v. Board of Directors ofN.D.H.S., 202 Conn. 206, 520 A.2d 217 (1987) (Defendant employer told the plaintiff "that there would be no problem with her CT Page 3263 teaching certain courses and levels the following year, that everything looked fine for her rehire for the next year, and that she should continue her planning for the exchange program." A notice posted on the school bulletin board stated: "All present faculty members will be offered contracts for next year.").
For the foregoing reasons, Count Four of the Amended Complaint fails to state a claim for breach of implied contract and, therefore, is ordered stricken.
Negligent Infliction of Emotional Distress
To sustain a cause of action for negligent infliction of emotional distress, the plaintiff has the burden of pleading and establishing (1) the defendant should have realized that its conduct involved an unreasonable risk of causing the distress and (2) that the distress, if caused, might result in illness or bodily harm. Montinieri v. Southern New England Telephone Co.,175 Conn. 337, 345, 398 A.2d 1180 (1978).
In Parsons v. United Technologies Corporation, 243 Conn. 66,700 A.2d 655 (1997), the plaintiff's employment was terminated and he was escorted out of the building by his employer's security personnel. He sued for wrongful termination and asserted other claims against his former employer, including negligent infliction of emotional distress. In upholding the trial court's decision striking the claim for negligent infliction of emotional distress the Supreme Court stated:
We first recognized a cause of action for negligent infliction of emotional distress in Montinieri v. Southern New England Telephone Co., 175 Conn. 337, 345, 398 A.2d 1180
(1978). We concluded, however, that in order to state such a claim, the plaintiff has the burden of pleading that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." Id.; see also Morris v. Hartford Courant Co., supra, 200 Conn. 683-84; 2 Restatement (Second), Torts § 313 (1965). Accordingly, negligent infliction of emotional distress in the employment context arises only where it is "based upon unreasonable conduct of the defendant in the termination process." Morris v. Hartford Courant Co., supra, 682. The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to CT Page 3264 sustain a claim for negligent infliction of emotional distress. "The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." Madani v. Kendall Ford, Inc., 312 Or. 198, 204, 818 P.2d 930 (1991).
243 Conn. at 88-89.
Count Seven of the Amended Complaint does not allege that the manner in which the Credit Union terminated the plaintiff was unreasonable. It does not allege that she was treated in an embarrassing or humiliating manner. It fails to state a cause of action for negligent infliction of emotional distress and is, therefore, ordered stricken.
By the court,
Aurigemma, J.